## PHILIP HOWARD v. LUDOVIC COLQUHOUN.

The court below instructed the jury to "look to all the testimony, and to the fact that some of the witnesses had been impeached, in order to decide whether or not they should believe those witnesses as to any facts that the defendants are required to establish, and, if they believe them, how far;" which instruction is assigned for error as a charge upon the weight of evidence. *Held*, that, although the charge might have been couched in more appropriate language, its scope and meaning imported only that the character of the witnesses had been attacked, and that it was for the jury to judge of the weight to which their testimony was entitled, in which there was no error.

An assignment that the court below erred in refusing the thirteen charges asked by the appellant, without pointing out the specific errors complained of, is too general and comprehensive in its terms, and might be disregarded by this court. (Paschal's Dig., Art. 1591, Note 618.)

Before a grant of land can be said to have been "issued" or "made," the name of the grantee must have been inserted in it.

A deed was executed in 1835 before a judge of the second instance and two instrumental witnesses. In 1839, the judge appeared before the clerk of the county court of the county comprising the land, and acknowledged his own and proved the maker's signature to the deed, upon which proof the deed was admitted to record. This court is of opinion that this was a good registration at that time, and that it was not necessary that the deed should afterwards be registered in a new county subsequently formed, within which the land was comprised. (Paschal's Dig., Art. 3716, Note 840; and Art. 4982, Note 1091.)

See the opinion in this case as to whether a grant from the State, issued by proper authority and in due form, can be impeached by a party other than the State for fraud in the issuance of such grant.

Mere discrepancies and apparent differences in the color of the ink and in the penmanship of a grant of twenty-five years' standing, issued by a colony commissioner to whom the land was subsequently conveyed by the grantee, are not sufficient to justify the inference that the grant was fraudulently issued. (See the opinion for the conclusions properly deducible from such circumstances.)

Oral testimony offered to impeach for fraud a grant issued a quarter of a century ago, when such testimony conflicts with the written memorials of the grant, should be received with great caution and close scrutiny.

The commissioner of a colony was the exclusive judge of the qualifications of a colonist, and the issuance of a grant by the commissioner is conclusive of the right of the colonist to the quantity of land granted him. If the grant were for a league, it is not competent to impeach it by proof that the colo-

nist was a single man, and as such was only entitled to a quarter of a league. Such questions are *res adjudicata*, the State not being a party. (Paschal's Dig., Art. 576, Note 359.)

Where the pleadings presented an issue of fraud, and the court instructed the jury that if such fraud existed the verdict should be found for the party pleading it, and the jury found that there was no fraud, this court will not revise the verdict.

APPEAL from McLennan. The case was tried before Hon. JOHN GREGG, one of the district judges.

The facts are fully shown in the opinion, but it seems desirable that the pleadings should be more fully set forth.

The appellee, Colquhoun, filed his petition on the 28th of March, 1855, against James and Isaac Jackson, then in possession of the league of land in controversy, for the recovery of the league. He alleged that the land was granted to William Fisher, as a colonist in the Nashville, or Robertson's colony, but did not set forth his chain of title in his petition. (For the boundaries of Robertson's colony, see Paschal's Dig., Art. 259, Note 301.) In his evidence, however, he deraigned title from Fisher through W. H. Steele, the commissioner of Robertson's colony, to himself.

On the 16th May, 1855, W. L. Scales filed his plea and answer, claiming to be the owner of the league in litigation, and the landlord of the defendants.

On the 16th of April, 1856, the plaintiff filed his amended petition, making Phil. Howard a party defendant.

On the 20th of October, 1857, the defendant, Scales, amended his answer, and set up the plea of innocent purchaser without notice of plaintiff's adverse title, and alleges that William H. Steele, at the time he issued title to Fisher, was the commissioner of Robertson colony; that the plaintiff pretended to deraign title from the said Steele by a pretended deed from Fisher to Steele; that he pretended to purchase from Fisher before he issued the grant; that it was not issued for Fisher, but in fact for Steele; that

Fisher had been and was, up to the date of issuing the grant, a single man, and only entitled under the colonization law to one-quarter of a league; that Steele was cognizant of these facts, and consequently the grant was void.

On the 16th March, 1858, the defendants amended their answer, and alleged that they purchased and paid for the land in controversy without actual or constructive notice of the plaintiff's claim or title.

On the 16th March, 1858, the defendant (Howard) amended his answer, and claimed one hundred and sixty acres of this land as a pre-emptionist, and further alleged that Steele was the commissioner, and purchased the land from Fisher before he issued the grant; that Fisher was a single man, and entitled to one-fourth of a league; that Steele knew it, and that the grant when issued was for Steele's benefit, and not for Fisher's.

On the 21st September, 1858, they filed an amended answer, and alleged that Steele purchased Fisher's right to one-fourth of a league of land, knowing that he was a single man and not entitled to more; that he purchased before the grant issued; that when he did issue the grant, he fraudulently ante-dated it to make it appear that the grant issued before he purchased from Fisher, and for the purpose of evading the law prohibiting him from purchasing lands from the colonists before the issuance of their titles by him as commissioner; that if the plaintiff had any title, he acquired it with a full knowledge of the fraud therein charged upon Steele, and without any consideration; therefore the plaintiff's pretended title was null and void.

On the 22d September, 1858, the defendants filed an amended answer, alleging that Fisher, up to the date of the revolution, was a minor under the age of twenty-one years, a single man, living with his mother and other relations, and not entitled to any lands as a colonist; that he lived in Austin's old colony; that Steele knew all this, and that he fraudulently caused Fisher to come into Robert-

son's colony, and claim one-fourth of a league; that no *empresario* ever ordered a survey to be made for Fisher; that he never petitioned for his land; that Steele purchased his claim to one-fourth of a league before he issued the grant; that he ante-dated the grant and fraudulently issued it for one league; that the plaintiff took it with a full knowledge of the fraud alleged, and for the purpose of aiding and abetting Steele in perpetrating the fraud; that he never paid any consideration for the land.

On the 23d of April, 1859, the defendants amended again, and alleged that, if the grant itself was not ante-dated, it was signed by Steele and the witnesses, or a part of them, and the name of the grantee left blank, and that the name of the grantee (Fisher) was inserted after the date of the pretended deed from Fisher to Steele for one-fourth of a league, that being all that Fisher as colonist could claim, and that Steele agreed, as part consideration for said land so pretended to have been purchased, to pay the government fees, &c.

So that the issues plead and on which the case turned were:

I. That the grant on which the plaintiff clained was void, because the grantee was not the head of a family, but a single man, and was therefore not entitled to a league, but at most to a third of a league, under the colonization law. (Paschal's Dig., Arts. 514, 565, 576, Notes 356, 359.)

II. That the grantee could not take as a colonist, because he was not domiciliated in Robertson's but in Austin's colony, and had not presented himself as the head of a family. (Paschal's Dig., Art. 580.)

III. That Steele, the commissioner appointed to extend the titles in this colony, was cognizant of the fraud, participated in it, and in fact perpetrated it, by issuing the title for a pretended colonist, but in trust for himself. (Paschal's Dig., Art. 611, Note 369.)

*F. W. Chandler*, for appellant, filed a printed argument, which first gave the foregoing history of the pleadings, and next insisted that the pleadings for defendants were proved, and that the facts proved should defeat the recovery.

He insisted, 1. The deed from Fisher to Steele itself proves that Fisher did not sign it; the name of Fisher appears on the instrument, not as Fisher's signature, but ·written, as is usual for a party who cannot write, to make his cross mark, and there is no mark visible, nor any evidence that he ever made any mark.

The affidavit of J. G. W. Pierson, attesting his own signature, with the certificate of the clerk of Milam county, that he made oath in due form of law that the signature of the signer, &c., does not prove a fact which the deed itself disproves. This deed was never authenticated, as required by any of our registration laws, so as to entitle it to be read in evidence.

If it be contended that the affidavit of E. S. C. Robertson proved up this deed and entitled it to be read in evidence, then we say the paper offered and read in evidence as the deed of Fisher flatly contradicts so much of Robertson's affidavit as goes to establish the fact that Fisher signed it. There is and can be no evidence that Fisher signed his name to this pretended deed, and Robertson does not swear that Fisher made his cross-mark and time had obliterated it.

[Much of the argument was devoted to an effort to disprove this evidence of Robertson, who swore that he saw Fisher execute the deed, and that he, Robertson, signed it as a subscribing witness.]

The fourth charge by the court was erroneous, and couched in language calculated to, and did, mislead the jury, and bias their judgment in reference to the credibility of the witnesses and weight of testimony. Such charge is expressly prohibited by law. (O. & W. Dig., Art. 491.)

This fourth charge, though not directly commenting on the weight of evidence, assumes to charge the jury that certain witnesses had been impeached, which was not true in law or fact, and, if true, it was a question for the jury to determine, and not a fact for the court to find and body forth in instructions to the jury, (see Mitchell v. Matson, 7 Tex., 3; Bachellor v. The State, 10 Tex., 258,) thus trenching upon the province of the jury, and taking for proved that which the jury alone could lawfully determine. The court charged the jury as follows:

"The jury will look to all the testimony, and the fact that some of the witnesses have been impeached, in order to decide whether or not they should believe those witnesses as to any facts that the defendants are required to establish, and, if they believe them, how far."

There were three witnesses testifying to facts material for the defense, and two witnesses established the fact that defendant's witnesses were men of ordinary good character and fair reputation for truthfulness.

[The argument here severely attacked the impeaching witnesses.]

The language of the court in this charge was calculated to mislead the jury, and forestall their judgment on the weight of testimony before them; and the verdict of the jury, in the teeth of all the evidence before them, can only be accounted for on the ground that they were governed by the erroneous instruction of the court, that the witnesses for the defense were impeached and discredited by the loose and illegal statements of Lewis Moore. For this alone the judgment ought to be reversed. (3 Tex., 342, 343.

[The argument devoted much space to discussing the thirteen charges, which the court said need not be noticed.]

The 13th charge seems to cover the law in the case, and is in the following words:

"If the jury believe from the evidence that a blank

original grant was issued on the 4th day of July, 1835, without the name of any grantee in the instrument, and if they believe from the evidence that the blank was filled up at any period afterwards with the name of William Fisher, the jury are charged that, at the date the grant purports to have been issued, it issued to no one. If the blank grant at that date specified no name as grantee, the title at that date vested in no one; the fee at that date was still in the government, and the land was not severed from the public domain. And if the jury believe from the evidence that Steele, the commissioner, subsequent to that date, or before he purchased Fisher's claim to a fourth of a league, and after said purchase, inserted Fisher's name in the blank grant, in order to disguise the fraud and make it appear that he had purchased after the grant issued, they are instructed to find for the defendants."

The main questions in this case are—1st, was the pretended title to Fisher null and void for fraud, if the facts alleged in defendant's answers are true? 2d, was the charge of fraud well sustained by the evidence in the case?

If the above facts are established by the evidence, then the title set up under the pretended grant to Fisher and his deed to Steele is null and void. Steele could not alienate to himself, either directly or indirectly, the lands that he, by his contract with Fisher, was to receive; and so this court has held in White v. De Leon, 9 Tex., 606, and in Flanikin v. Fokes, 15 Tex., 180, and authorities cited in the above cases.

This court judicially knows that Commissioner Steele was capable of perpetrating frauds under the forms of his official duty.

In this case he but adhered to his usual practice of taking advantage of his position to perpetrate acts of wholesale plunder upon the public domain, by issuing a grant for a whole league, of which grant he was the sole beneficiary, when he knew, as the evidence proves, that Fisher,

a single man, was only entitled to, and only applied for, a grant of one-fourth of a league. Such a grant, so pregnant with fraud, so transparently covinous in the absence of all the lights of jurisprudence, would be held, in the forum of conscience and common sense, null and void.

William Fisher, the grantee, testified that he was entitled to one-fourth of a league; that the grant never issued to him; that he did not know where the land was situated; that he never received a league of land as a colonist, and repeats that one-fourth of a league was all that he was entitled to at the time he sold to Steele; that he made the sale of his claim to Steele, in 1833, for $50; that he sold to Steele before his grant was issued, and that the reason no grant was issued to him, was because there was no stamped paper convenient.

The other witnesses state, that Steele told Fisher, at the time he sold his claim, that he could not issue the grant then because he had no stamped paper; and Fisher, in answer to 1st cross-interrogatory, says he does not know who received the grant.

All the above facts are corroborated and strengthened by the testimony of John Fisher.

His answer to 4th interrogatory shows Steele's excuse for not issuing a grant to his brother to have been a want of stamped paper; that Steele proposed to buy William Fisher's claim, and that William Steele then sold it to him for $50; that he sold only his claim to one-fourth of a league.

And the testimony of the two Fishers is, as to all material facts stated, corroborated by the evidence of Jackson Hensely, with the slight discrepancy as to the time when Steele bought William Fisher's claim, Hensely saying the sale was made in 1835 instead of 1833, as stated by the Fishers.

In his answer to 11th cross-interrogatory, he says he made the arrangement with Steele, and sold Fisher's claim

and the claims of the others.    He says also that Steele took advantage of their ignorance, and made them believe that he was taking bonds for title, when he was taking deeds to the lands.

The other portions of the argument were upon the facts, and were an effort to prove, from circumstances, that the grant was ante-dated or issued in blank, and to break down Robertson's evidence to the contrary.

*Thomas Harrison,* for appellee.

SMITH, J.—This is an action of trespass to try title, instituted by the appellee, Colquhoun, 28th March, 1856, against James and Isaac Jackson, to recover the league of land granted July 4, 1835, by the commissioner of Robertson's colony, Wm. H. Steele, to Wm. Fisher, as a colonist in that colony, and conveyed by said Fisher to said Steele, October 5, 1835, and by Steele to the appellee 13th day of February, 1839.

W. L. Scales was permitted to defend as the landlord of the Messrs. Jackson; and by amended petition, filed April 16, 1856, the appellant, Philip Howard, is made party defendant below.

A trial was had and a verdict and judgment rendered in favor of Colquhoun.    The District Court, however, granted the defendants below a new trial, and afterwards, on the 5th April, 1859, another trial was had, with a similar result, with which all the other defendants appear satisfied but the appellant, Howard.    He brings the cause here upon an appeal, and among numerous errors assigned, the first is, that the court erred in charging the jury that they would look to all the testimony, and the fact that some of the witnesses had been impeached, in order to decide whether they should believe those witnesses as to any facts in the cause.

It is insisted by the appellant, that the judge charged

upon the weight of evidence, and left the jury under the impression that the court had, as a matter of law, charged them that the witnesses were impeached, and that they had no right to determine whether they were entitled to credit or not. The language of the charge might have been couched in more appropriate terms perhaps; but we are of opinion that the scope and meaning of the charge were, that their character had been attacked, and it was for the jury to judge of the weight their testimony was entitled to, and that the jury must have so understood it. We hold there was no error in this.

The defendants below asked of the court thirteen charges to the jury, all of which were refused and assigned as error. We might disregard this assignment as being too general and comprehensive in its terms, in not pointing out the specific error complained of. However, it will be observed that they are irrelevant, not correct in law, and therefore rightly refused, or were given in substance by the court in its charge to the jury. The eleventh charge asked and refused and specially assigned, we are of opinion, was substantially given to the jury. The court instructed the jury, that if Steele, the commissioner, became the owner of William Fisher's claim before the grant issued, and was the beneficiary at the time, then the grant was void for fraud. The grant must be complete, and the name of the grantee must have been inserted in the grant before it could have been said to be "issued" or "made," as referred to in the charge.

The appellant objected to admitting in evidence the deed from William Fisher to William H. Steele without proof of its execution, and insisted that it had not been duly registered, so as to be admitted in evidence under Art. 469, O. & W. Dig. [Paschal's Dig., Art. 3716, Note 840.]

The deed was executed October 5, 1835, by William Fisher to Steele, before J. G. W. Pierson, judge of the second instance, and two instrumental witnesses. Pierson,

on the 13th April, 1839, appeared before the clerk of the
County Court of Milam county, acknowledged his signa-
ture to the deed, and proved that of the maker, William
Fisher, and it was placed on record in that county, in
which the land then lay. This is thought to be a sufficient
registration at that time, and that it was not required of
the interested party to register it again in new counties
formed from the territory of Milam, and in which this
land should happen to be. (O. & W. Dig., Art. 1742;
Paschal's Dig., Art. 4982, Note 1091.)

In the case of McKissick v. Colquhoun, 18 Tex., 149, a
deed executed, authenticated, and recorded almost precisely
like this, the court held to be properly registered.

The appellee, however, has used the precaution to have
the deed again proved by the other subscribing witness,
Robertson, in 1856, and placed on record in Bosque county.
We believe the deed was properly received in evidence.

The most important point, and one upon which the
whole case was made to turn, is involved in the assign-
ments that the verdict of the jury was contrary to law
and evidence.

The court charged the jury, that the plaintiff below had
sufficient title to recover, unless the original title was void
from the time it was made out by Steele, the commissioner;
"that it is presumed to have been issued in good faith, and
is valid, not void; that fraud cannot be presumed, but may
be proved directly or by circumstances; that if Fisher were
entitled to only one-fourth of a league of land, and Steele,
knowing this, purchased his claim, and issued a title for
his own benefit, this was a fraud, and renders the title void;
that if Fisher's title was bought by Steele before it issued,
this would be fraud.

This charge fully presented the distinct proposition to
the jury: If Steele, the commissioner, purchased and
owned the head-right claim of Fisher at the time he passed
upon his qualifications and issued the grant, it would be

fraud, and for that the grant would be void. This, as a proposition of law in this case, if it can be maintained at all, is certainly liable to severe criticism. That fraud, the evidence of which rests in the memory of witnesses, can be established a quarter of a century after the grant has been issued by the proper authority, and with all the due forms of law, renders the grant void and defeats the title in the hands of an innocent purchaser from the grantee, presents itself to us as an alarming doctrine. It is believed no such doctrine has ever been announced by this court. Mr. Justice WHEELER says, in the case of Johnson v. Smith, 21 Tex., 722, "That there certainly should be some period of time beyond which grants and patents should cease to be open to attacks in the hands of innocent *bona fide* holders. The door should be closed at some time against temptations to frauds and perjuries; otherwise there would be no security to paper titles. No one can purchase the fairest apparent title without taking the precaution to inquire into the circumstances of its emanation." And he further observes: "As the question of fraud must be referred to the decision of a jury, men's titles may be made to depend on the frail and treacherous memory of witnesses, or their own personal popularity, or freedom from popular prejudice."

These remarks we regard as very appropriate and very just. If titles can be thus attacked, time, instead of lending a helping hand to cure apparent defects and remove opposing claims, will only be the means and afford a ready opportunity of rendering them less secure against mistakes, frauds, and perjuries. The older the title, the less secure it becomes against such attacks. Presumptions of the regularity and justness of old titles should be freely indulged, in order, as stated by Chancellor Pluckett, "*to repair the injuries committed by time.*"

Many authorities can be cited against the right of a third party to plead fraud in the procurement of a grant

10—XXVIII

issued by legal authority, and that such objections to the grant can only be taken by the government in her own name in proceeding directly to annul the grant, and that these questions are exclusively confined to the Government and the grantee; that while the Government is content, no person can impeach the grant, and especially one who has no title or claim whatever to the land, as appears to be the condition of the appellant in this case, who appears to be simply an intruder upon the premises, without any pretence of claim whatever. He pleads a claim, but proves none. (Field v. Seabury, 19 Howard, 332; Polk's Lessee v. Wendell, 5 Wheaton, 293; 10 Johnson, 24; 3 Head, 50; White v. Burnley, 20 Howard, 247; Owens v. Raines' Lessee, 5 Haywood, 106; Bomer v. Hicks, 22 Tex., 155.)

In this case, we do not deem it necessary to determine whether the charge of the court to the jury, presenting the question of fraud in the grant, was proper or not, for the jury, in their verdict, find that there was no fraud committed, and the charge, if erroneous, is in favor of the appellant, and can furnish him no grounds of reversal.

We are of opinion, that the evidence in the cause fully sustained the verdict. The appellee produced a grant issued by proper authority and regular in form, dated 4th July, 1835, and proved its genuineness by one of the witnesses, Robertson; the deed from the grantee to Steele, dated 5th October, 1835, executed before the judge of the second instance, and after that proved by two of the witnesses, and duly recorded since 1839. This deed recites the consideration to be $500, and that the land had been granted to him as a colonist. The deed from Steele to the appellee, dated April, 1839, duly registered in that year, and with evidence that he paid $800 for it, not conclusive, but satisfactory, we think.

There is no evidence that he had any notice of any infirmity in the title, and he shows himself to have been

an innocent purchaser for value since 1839. The appellant, to impeach this title, offers the testimony of three witnesses to prove that William Fisher, the grantee, sold his claim to the commissioner, Steele, before the title was issued to him, and that Steele was the real and beneficial owner of the land when he issued the grant for a league, and when Fisher was entitled only to one-fourth of a league. The testimony of the two Fishers is in direct conflict with the paper title, as proved by the appellee, and also conflicts with the testimony of Hensly, who testifies the sale was made through him, and was in 1835; that Fisher executed a deed to Steele, and he believes the grant was then issued. No deed but the one produced by the appellee has been produced or attempted to be produced, and the character of these witnesses was impeached.

The appellant attempted also to prove that the grant had been ante-dated, or that the name of Fisher was inserted in the blank left after the date of the grant, and subsequent to the deed from Fisher. In answer to this, we say there is no positive evidence of the fact that the grant was ante-dated, or that the name of Fisher was inserted in the grant after its date.

There is no direct evidence of the charge of fraud and corruption on the part of the high government official, the commissioner of the colony; nothing shown of this alleged official dereliction and turpitude, but some apparent differences of penmanship in the *protocol,* or some slight variations in the shades of the ink with which the name of Fisher was written and the residue of the grant. It is seriously urged that it looked suspicious! It looked like it had not all been written by one person, with the same pen and ink, and therefore it is contended the grant must have been ante-dated, and that it was consummated in fraud and official corruption on the part of the commissioner, and all those engaged with him in the important office of extending titles to the colonists. We must con-

fess that we are not prepared to draw the inference contended for from circumstances so slight and trivial; but we are of opinion, that at this late day, when all who took a part in the scene have gone "from among us," and with them has departed the correct knowledge of the whole transaction, and time has rendered it impossible to unfold the whole truth connected with the emanation of the grant, it is the duty of the jury and the court to hold, that these discrepancies and apparent differences in the mechanical work and color of the ink used in the preparation of the grant were not the work of fraud and official dereliction, but were consistent with an honest and faithful discharge of the official duties of those who prepared and issued it.

It is as rational to infer that the differences in the handwriting and color of ink used in preparing the grant occurred in the regular line of the duties of the officers, and were as honestly and properly made, as it is to infer from them that they were the work of official misconduct and fraud. The mere manual labor of preparing the grant prior to the signature of the commissioner may have been done by a number of officials connected with the office, and in the proper discharge of their duties, and each one may have performed his part with different pens and with different colored ink. We know of no rule of law that required the whole of the grant to be prepared by one person and with the same pen and ink. In such cases the law prefers throwing the mantle of charity over all such discrepancies, and will draw the more humane conclusion, that the officers acted correctly, and did not commit fraud and official dereliction. Their acts will be presumed to have been done as the law directed them to be done.

The testimony offered by the appellant, to prove that the commissioner was the owner of the land at the date of the issuance of the grant, is not satisfactory; the witnesses disagree as to the date of the sale of the grantee, Fisher, to

William H. Steele, and the evidence offered directly conflicts with the paper title made by the parties at the time to perpetuate their contracts and rights under them, and the witnesses disagree among themselves upon several matters of fact, connected with the date of the sale to Steele, the consideration paid at the time, &c., all going to show how dangerous it is to permit the testimony of transactions that have long since past to depend upon the frail memories of witnesses offered in evidence to impeach a title, apparently possessed of all the *indicia* of authority and legal form. Such testimony should be received with much caution and close scrutiny at this late day, when it conflicts with the record memorials of titles issued and perfected a quarter of a century ago. (Portis and Wife v. Hill's Heirs, 14 Tex., 69.)

The commissioner was made the exclusive judge of the qualifications of the colonist Fisher, and the issuance of the grant to him precludes all inquiry respecting his right to a league, or less than that amount. It is *res adjudicata*, and cannot now be impeached on the ground that he was a single man and without a family. (Johnson v. Smith, 21 Tex., 722; 15 Tex., 590; 10 Tex., 503.)

There were two trials of this cause in the court below, and a verdict in each instance was rendered against the appellant, Howard; and we are of opinion the verdict was fully sustained by the evidence, and that there is no error in the judgment. Therefore, it is

AFFIRMED.